1  PHILLIP A. TALBERT
   United States Attorney
2  VICTORIA L. BOESCH
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, CA  95814
4  Telephone:  (916) 554-2700
   Facsimile:  (916) 554-2900
5  victoria.boesch@usdoj.gov

6  Attorneys for Postmaster General Megan L. Brennan

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TONIA JOHNS,<br><br>                    Plaintiff,<br><br>          v.<br><br>MEGAN J. BRENNAN, POSTMASTER GENERAL, UNITED STATES POSTAL SERVICE,<br><br>                    Defendant. | Case No.: 2:15-cv-01910-JAM-DB<br><br>**ORDER GRANTING POSTMASTER GENERAL SUMMARY JUDGMENT** |

The Postmaster General respectfully submits the following proposed order reflecting the Court's ruling during the May 16, 2017 hearing that granted summary judgment to the Postmaster General on all of Plaintiff's remaining claims.  The Postmaster General provided this order to Plaintiff's counsel for her review.  Plaintiff's counsel provided extensive proposed edits, some of which the Postmaster General incorporated.  The Postmaster General then provided the revised order to Plaintiff's counsel, who indicated that she would not object to this version.

The parties in this employment discrimination case filed cross motions for summary judgment on Plaintiff Tonia Johns' three claims for (1) failure to accommodate her disability resulting in constructive termination, (2) failure to engage in the interactive process to provide a reasonable accommodation for her disability, and (3) interference with her right to medical leave under the Family and Medical Leave Act (the "FMLA"). After considering the parties' submissions and oral arguments, the Court grants the Postmaster General's summary judgment motion and denies Johns' summary judgment motion.

## I.  FACTUAL BACKGROUND

The record before the Court reveals the following facts. Where the parties submitted evidence from which a jury could reach different conclusions, the Court views the facts in the light most favorable to Plaintiff Johns.

### A.  Johns' Employment with the Postal Service

Tonia Johns worked for the United States Postal Service from approximately December 2012 to February 27, 2014. In February 2014, Johns worked as a Postmaster Relief ("PMR") at the Amador City Post Office. The Amador City Post Office is a small office that, since 2012, has been open only four hours a day on weekdays. Johns worked alone at Amador City from approximately 12:25 p.m. to 4:45 p.m. Monday through Friday and Saturday 9 a.m. to 11:30 a.m. Her duties there included receiving and sorting mail and distributing mail to Post Office boxes and to customers. Johns also picked up extra hours working at the Sutter Creek Post Office when mail volume there was high. She generally worked for 10 to 15 hours per week at Sutter Creek, where she distributed mail to Post Office boxes, a task referred to as "boxing mail."

### B.  Johns' Initial Termination and FMLA leave

Johns broke her neck in a car accident on February 28, 2014. Her doctors placed her completely off work from February 28, 2014, to September 8, 2014, because of her broken neck.

On March 6, 2014, the computer system of the Postal Service's centralized FMLA center made an automated determination that Johns was ineligible for FMLA leave. Though Postal Service employees did not realize it at the time, this determination was incorrect. A glitch in the computer system caused the incorrect determination based on a break in service that Johns had when she switched from one Postal job to another in approximately October 2013. The computer's determination generated

a March 6, 2014 letter to Johns telling her that she was not eligible for FMLA leave.  It also caused the Postal Service's leave management system (the "eRMS" system) to indicate to Postmaster Debra Baker that Johns' FMLA leave had been disapproved.

On March 25, 2014, Johns mailed in an FMLA application and her husband informed Postmaster Baker that Johns had submitted the application.  Postmaster Baker, who had learned from the eRMS system that Johns' FMLA leave had been disapproved, conferred with Labor Relations Specialist Sukhdeep Singh about whether she could terminate Johns' employment.  He agreed that removal was appropriate.  On March 26, 2014, believing that Johns' absence was not FMLA protected, Postmaster Baker sent Johns a notice of termination for being unavailable to work.  The next day, after receiving the termination notice, Johns filed an EEO complaint alleging discrimination for wrongful termination. (Plaintiff's Undisputed Fact 15).  The day after that, the Postal Service FMLA center sent Johns a letter stating that she was eligible for FMLA leave and inviting her to submit medical documentation to seek approval of such a leave.  The FMLA center's records show that it sent that letter based on a call from Johns informing them of her correct Postal Service start date, leading the center to correct the computer error based on Johns' break in service.  (King Decl. Ex. A).

After filing her EEO complaint, Johns had two conversations with Postal Service EEO Specialist Trent Andrews in which he offered money to settle her claims.  (Plaintiff's Undisputed Fact 16).  On both calls, Johns refused the offers of monetary resolution and asked the Postal Service to reinstate her to her job.  (Plaintiff's Undisputed Fact 17).  Trent Andrews did not offer to reinstate Johns and told her that her job "was not on the table."  (Plaintiff's Undisputed Fact 18).  On approximately May 12, 2014, Johns informed Andrews that she would be retaining an attorney.  (Plaintiff's Undisputed Fact 19).[1]

After becoming aware that Johns had been FMLA eligible at the time of her termination, Postal Service management rescinded her termination on May 16, 2014.  Though the FMLA center had received Johns' FMLA medical documentation certification in April 2014, it had been unable to process it because of Johns' termination.  After her reinstatement, the FMLA center processed the certification and sent Johns a May 27, 2014 letter approving her for 12 weeks of FMLA leave from February 28,

---

[1] The Postmaster General objected to all the evidence in this paragraph as violating Federal Rule of Evidence 408.  The Court sustains that objection below.

2014, to May 23, 2014.

**C.  The Interactive Process and Reasonable Accommodation**

On June 3, 2014, Noah Rodriguez sent Johns a letter inviting her to meet with the Postal Service's District Reasonable Accommodation Committee ("DRAC").  That letter invited Johns to call Rodriguez at the DRAC phone number with any questions regarding the reasonable accommodation process.  Accompanying the letter was a brochure explaining that process.  The next day, Johns filled out and returned a form confirming her interest in the DRAC process.  Two weeks later, she filled and returned an Initial Interactive Process Questionnaire.  In that June 2014 questionnaire, Johns stated that she was currently unable to work because of a broken neck.  Asked what she needed to enable her to perform the full duties her job, she indicated that she needed an extension of her medical leave so that she could heal.  Johns also submitted a work status report to the Postal Service in which her doctor placed her off work from June 4, 2014 through July 13, 2014.  Johns remained on unpaid leave during this time.

In early July 2014, Rodriguez sent Johns a letter inviting her to participate in a phone meeting with DRAC on July 22, 2014.  A week after that letter, Rodriguez sent another letter requesting that Johns submit medical documentation in advance of the July 22 meeting.  On July 22, Johns met with DRAC by phone.  She stated that she had medical appointments scheduled in late July and early August and that she would provide Postal Nurse Mary Alice Gower with updated medical information after those appointments.  Rodriguez sent Johns a July 22, 2014 letter reflecting all of this and instructing her to contact Human Resources at the DRAC phone number with any questions.  Johns subsequently submitted work status reports to the Postal Service in which her doctor placed her off work from July 28, 2014 through September 8, 2014.  Johns remained on unpaid leave during this time.

Approximately six weeks after the July DRAC meeting, on September 5, 2014, Rodriguez sent Johns a letter inviting her to participate in another DRAC meeting on September 23, 2014, and asking her to call the DRAC number to confirm.   On September 9, 2014, Johns broke her ankle, resulting in her doctor putting her completely off work through mid-October 2014, and restricting her activities (including allowing her to lift/carry/push/pull no more than 0 pounds) from that date through late November 2014.  Johns remained on unpaid leave throughout that time.

About a week before the September 23 scheduled DRAC meeting, Rodriguez sent Johns a letter referencing a phone message Johns left at the DRAC number indicating that she was not ready for the DRAC process at that time because of surgery. That letter told Johns to call the DRAC number if she would like to schedule a DRAC meeting in the future. Five days later, Rodriguez sent Johns another letter noting that, per her recent medical documentation, her return to work date appeared uncertain. In light of this uncertainty, the letter informed Johns, the DRAC was administratively closing her file. The letter went on to instruct her to call the DRAC number to schedule an appointment if she wanted to meet with DRAC to discuss reasonable accommodation upon her return to duty.

Administratively closing a DRAC file means that DRAC does not pursue the matter for a while pending receipt of further information from the employee indicating that there may be a reasonable accommodation that would allow that employee to perform the essential functions of her job. The employee is free at any time to call the DRAC number and schedule an appointment with DRAC if she believes that conditions have changed such that a new or different reasonable accommodation is now possible. When an employee does so, DRAC meets with her (by phone or in person) to determine whether a new or different reasonable accommodation would allow her to perform the essential functions of her job. Administrative closure simply acknowledges that the file is dormant for some time.

Johns called the DRAC number on October 21, 2014, and spoke to the DRAC secretary, telling her that Johns did not want DRAC to close her file. The DRAC secretary instructed Johns to continue updating Nurse Gower with Johns' medical information. That same day, Johns called Nurse Gower, who was on DRAC, to update her on Johns' medical condition. In Johns' October and/or November 2014 conversations with Nurse Gower, Johns talked to Nurse Gower about the possibility of boxing mail at the Sutter Creek office. [2] (Johns Supp. Decl. ¶ 6). At that time, Johns was in a walking boot because she had broken her ankle. Johns told Nurse Gower that she might need a small stool to rest her foot on

---

[2] As the Court discussed at the hearing on these motions, the Court notes that Johns did not state that she requested this accommodation during her October and November 2014 conversations with Nurse Gower either in her deposition testimony about conversations with Nurse Gower or in her original declaration to this Court, which described both conversations. Though these omissions trouble the Court, it nonetheless credits the testimony in Johns' Supplemental Declaration, in which she describes requesting the accommodation during the October and November 2014 conversations, because the Court views the facts in the light most favorable to Johns in granting the Postmaster General's summary judgment motion.

while standing and a medical knee walker to move around. Nurse Gower told Johns that these requests did not seem unreasonable and that she would pass them on to DRAC. (Johns Supp. Decl. ¶ 6). Nurse Gower also told Johns that, as the OHNA (Occupational Health Nurse Administrator), she was not responsible for job assignments. (Minkler Decl. Ex. H (Gower Notes), Ex. V (Gower Depo. 73:15-74:7)). In Johns' November 2014 conversation with Nurse Gower, Johns also stated that she was eager to return to work under Sutter Creek Postmaster Mary Fine, whom Johns liked. Nurse Gower emailed Johns' updated medical information to Postmaster Mary Fine and Labor Relations Manager Tawnya King and suggested a referral to DRAC. Postmaster Fine informed DRAC that she had received updated medical information from Johns. Neither DRAC nor anyone else from the Postal Service contacted Johns about her proposed accommodation. During October and November 2014 (and up through January 4, 2015), Johns remained on unpaid leave, and her doctors restricted her activities by prohibiting her from twisting her torso/spine and allowing her to lift/carry/push/pull no more than 0 pounds.

The evidence in the record before the Court shows that boxing mail involves first moving tubs and trays full of mail that weigh on average from 10 to 25 pounds to the box sections. In the Sutter Creek Post Office, there are six box sections with different numbers of boxes in each section and a variety of box sizes. One of the largest box sections includes 180 boxes. The boxes go from eleven inches off the ground to approximately seventy-one inches from the ground. When boxing mail, the first step is to move a tub or tray to the appropriate box section. Then, one takes mail (letters, manila envelopes, magazines, newspapers, and smaller parcels weighing from one ounce up to 15 to 20 pounds) from the trays and/or tubs and puts it into the Post Office box identified in the address on the piece of mail at whatever level the box resides. This requires constant reaching, stooping, and turning to put mail into the various boxes. Boxing mail also involves moving parcels to the parcel lockers immediately outside of the Post Office and returning parcels that will not fit into the parcel lockers back into the Post Office. The Sutter Creek Post Office receives a large volume of parcels weighing up to 70 pounds. Johns appeared to recognize this in an email to her doctor stating "my job requires me to lift up to 70 pounds and is physically demanding."

On January 6, 2015, Johns left a voicemail for Nurse Gower to discuss her possible return to work and faxed Nurse Gower a doctor's report restricting Johns' activities from January 5, 2015 through February 1, 2015. Johns remained on unpaid leave throughout this time, during which her doctors prohibited torso twisting and imposed a 10-pound lifting restriction. Nurse Gower did not return Johns' January 6, 2015 call or fax, but forwarded Johns' updated medical information to Postmaster Fine and Labor Relations Manager King and recommended that the matter be referred to DRAC. On February 23, 2015, Johns left Nurse Gower three voicemail messages, and Nurse Gower did not return Johns' calls. On March 6, 2015, Johns faxed Nurse Gower work status reports covering February 2, 2015, through April 26, 2015. Those reports prohibited torso twisting and imposed a 10-pound lifting restriction. Nurse Gower did not respond to Johns' March 6, 2015 fax, but forwarded her updated medical information to Postmaster Fine and Labor Relations Manager King and recommended that the matter be referred to DRAC. Johns remained on unpaid leave for this period up through April 3, 2015, when she submitted a letter to the Postal Service resigning from her position. In that letter, Johns stated that she had not had contact with Nurse Gower for the past several months despite her repeated efforts. She also said that she believed the Postal Service had no intention of discussing her return to work or considering her for any position within her medical restrictions and that she felt forced to resign from her position in hopes to gain employment elsewhere.

### D. <u>The Administrative Proceeding</u>

In late June 2014, Johns filed a formal EEO administrative complaint. The Postal Service initially accepted three issues for investigation. Johns' counsel then wrote two August 2014 letters requesting to amend Johns' administrative complaint. Counsel's second letter also asked that the Postal Service inform her as soon as possible if the Postal Service chose not to revise the issue list "so that Ms. Johns may submit a separate and timely complaint for those items." The Postal Service then amended the list of issues accepted for investigation to include four specific issues. Those issues were discrimination based on Physical Disability (Neck), Genetic Information (Blood disorder), and Retaliation (unspecified) when:

1. On or about February 20, 2014, Johns was not allowed to return to work after an absence despite having medical clearance;

2.     On March 27, 2014, Johns was issued a Notice of Removal;

3.     On or about February 15, and 27, 2014, Johns was not paid for hours that she worked, and;

4.     On an unspecified date, the Postmaster improperly disclosed Johns' medical information to another employee.

Two months after her resignation, Johns responded to Postal Service interrogatories in the administrative proceeding specifically asking her to identify all the claims she intended to raise in the administrative case.  The first interrogatory listed claims the Postal Service understood Johns was pursuing (relating to a February 20, 2014 absence, February 15 and 27, 2014 hours worked, an alleged medical information disclosure, a March 27, 2014 Notice of Removal, and the filling of Johns' position after the March 2014 removal) and asked if she was pursuing any others.  The next interrogatory asked her to identify each other claim she intended to raise in the EEO case.  Johns identified three additional claims concerning incidents in January and February 2014.  Though this response post-dated her resignation by two months, Johns said nothing about her April 2015 resignation and nothing about an alleged constructive discharge.  Johns provided these discovery responses while represented by counsel.

Johns' June 2015 discovery responses did assert elsewhere in those responses that Johns could have returned to work on October 12, 2014.  Because of this assertion, a Postal Service attorney asked DRAC to meet to review Johns' medical restrictions during October 2014 through her April 3, 2015 resignation and to determine whether it could identify a reasonable accommodation that would have allowed Johns to perform the essential functions of her job during that time.  On June 16, 2015, DRAC met and determined that there were no such reasonable accommodations because of the limitations imposed by Johns' doctors, especially the prohibition on any torso/spine twisting and the first 0-pound and then 10-pound lifting restrictions.

## II.     ANALYSIS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Initially, the moving party must provide evidence demonstrating the absence of any genuine dispute of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the

opposing party to establish a genuine dispute. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In opposing summary judgment, the party cannot rely on allegations in its pleadings but instead must tender evidence in the form of affidavits and/or other admissible evidence. *See* Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11 (1986). The opposing party must also demonstrate that a disputed fact is material, that it makes a difference in the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And the party must show that the dispute is genuine, that a reasonable trier of fact could return a verdict in its favor. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

**A.** **Constructive Discharge**

**1.** **Failure to Exhaust Administrative Remedies**

In order to bring Rehabilitation Act claims against the Postal Service, Johns first had to exhaust her administrative remedies. *Boyd v. U.S. Postal Service*, 752 F.2d 410, 412-13 (9th Cir. 1985). She failed to do so regarding her claim of constructive discharge because she brought no such claim during the administrative proceeding and the Court holds that, as a matter of law, her constructive discharge claim is not like or reasonably related to her administrative discrimination claim. Johns' administrative claim did not allege a discriminatory pattern or practice but complained of specific conduct in early 2014.

As amended by her counsel, Johns' administrative complaint made claims regarding allegedly discriminatory actions in early 2014 relating to her blood disease and broken neck. And Johns' June 2015 administrative discovery responses, which post-dated her resignation, explicitly identified her claims as involving alleged discrimination in early 2014. Johns gave no indication in the administrative proceeding that she viewed her resignation more than a year after the alleged discrimination as an adverse action constituting a constructive discharge. This failure to raise constructive discharge as an issue for administrative consideration and investigation constitutes a failure to exhaust her administrative remedies for a constructive discharge claim. *See Ong v. Cleland*, 642 F.2d 316 (9th Cir. 1981).

The Ninth Circuit's decision in *Ong* is squarely on point, with facts that mirror those here. In *Ong*, the plaintiff took disability retirement in the middle of her ongoing EEOC proceedings. 642 F.2d

317-18.  Once the EEOC proceedings concluded, she filed a constructive discharge claim in court.  *Id.*

The Ninth Circuit held that she failed to exhaust her administrative remedies because her EEOC charge

included no facts about a constructive discharge claim, she had not amended her EEOC charge to

include such facts, she did not otherwise administratively raise the issue, and the EEOC had not

investigated it.  *Id.* at 319-20.  The same is true here.  And here, as in *Ong*, Johns' failure to raise the

constructive termination issue subverts the policies animating the exhaustion requirement.  *Id.* at 320.

Administrative exhaustion gives the agency an opportunity to consider an issue before a lawsuit begins,

develops an administrative record, "encourage[s] informal conciliation," and avoids unnecessary federal

court suits.  *Id.*; *see also Jones v. Gates Corp.*, No. C98-73 MJM, 1999 WL 33656873, at *7, *10 (N.D.

Iowa Aug. 26, 1999) (holding that, because his administrative complaint made no mention of

constructive discharge so that the issue was never "investigated nor subjected to conciliation," the

plaintiff failed to exhaust a constructive discharge claim).

> Counsel represented Johns during the administrative proceedings, and Johns had every

opportunity to amend her complaint and to identify claims she wished to pursue.  Nonetheless, Johns

failed to allege constructive discharge or to identify her resignation as the basis for any of her

administrative claims – including when directly asked to identify her claims shortly after her resignation.

That failure deprived the Postal Service of an opportunity to address and resolve during the

administrative process her concerns regarding allegedly intolerable discriminatory working conditions

forcing her to resign.  Because Johns did not administratively exhaust her constructive discharge claim,

she cannot pursue that claim in court.  *Boyd*, 752 F.2d at 412-13.

> Johns argues that her constructive discharge claim is "part of the disability claim included in her

EEOC charge" but the evidence demonstrates otherwise.  And Johns offers no explanation as to why, if

this was so, she failed to mention constructive discharge when asked to identify her claims.  Instead, she

relies on general statements in Ninth Circuit cases allowing courts to construe EEO pleadings liberally.

But none of those cases involve a plaintiff's clear failure to identify a claim when asked to do so directly

just shortly after the incident at issue.  Johns essentially asks this Court to ignore her verified discovery

response and find that her claim of constructive discharge in April 2015 is "related" to her early 2014

allegations.  It is not.

Johns cites to *Wiederhold* for support. But in *Wiederhold* the employee, suffering from a painful foot condition, alleged on her EEOC intake questionnaire that her employer intentionally scheduled her for tasks that were hard on her feet – as if trying to cause her misery. *Wiederhold v. Sears, Roebuck and Co.*, 888 F.Supp.2d 1065, 1087 (D. Or. 2012). She also alleged that the employer had "backed her into a corner" and "made her lose the income and medical her family needs to survive." *Id.* These allegations, combined with the EEOC investigator knowing about and addressing Wiederhold's resignation, led the district court to conclude that the EEOC was on notice regarding Wiederhold's claim that her employer forced her to resign. *Id.* at 1087-88. Here, Johns made no such allegations regarding deliberate, discriminatory hostility leading to her resignation. And, two months after her resignation, she described her claims as involving discrete acts in early 2014. Johns also cites *Wiederhold* because it distinguished *Ong* and analogized to *B.K.B. v. Maui Police Dept.*, 276 F.3d 1091 (9th Cir. 2002) (as amended Feb. 20, 2002). *Wiederhold* reasoned that the plaintiff was more similarly situated to the *B.K.B.* plaintiff than the *Ong* plaintiff because in both *Wiederhold* and *B.K.B.* it was the agency, and not the plaintiff, who had omitted the constructive discharge claim. 888 F.Supp.2d at 1087-88. Here, it was Johns, and not the agency, that omitted a constructive discharge claim from the administrative proceeding. The Court therefore concludes that Johns' case is much more analogous to *Ong* than *B.K.B.*

Johns also relies on her April 2015 resignation letter as alleging constructive discharge because that letter stated that Johns felt forced to resign. But use of the word "forced" did not provide notice to the Postal Service that Johns sought to pursue a constructive discharge claim in her administrative case. And the Postal Service did not understand Johns' resignation letter as making a constructive discharge claim. The Postal Service attorney's letter to Johns' counsel regarding DRAC's June 2015 meeting made this clear. It addressed Johns' resignation letter as a claim that the Postal Service had not returned Johns to work that fell within her medical restrictions from October 2014 through her April 2015 resignation. Like Johns' administrative discovery responses, the Postal Service attorney's letter said nothing about intolerably hostile and discriminatory conditions allegedly forcing Johns to resign.

During oral argument, Johns relied on the *Ramirez* case, cited only in passing in her opposition and reply brief. In that case, the plaintiff's administrative complaint mentioned only a 1974 layoff, but his judicial complaint included 1974 and 1975 layoffs. In *Ramirez*, the Ninth Circuit held that the 1975

layoff was a new act of alleged discrimination that reasonably related to the plaintiff's original charge. *Ramirez v. National Distillers and Chemical Corp.*, 586 F.2d 1315, 1320-21 (9th Cir. 1978). This was because, in the original charge, the plaintiff had alleged a continuing pattern and practice of disparate treatment. Johns made no such allegation in her administrative complaint.

Because Johns failed to exhaust her administrative remedies with regard to a constructive discharge claim, she cannot pursue such a claim in court. The Postmaster General is therefore entitled to summary judgment on that claim.

### 2. Substantive Constructive Discharge Requirements

Johns constructive discharge claim also fails because she has not provided evidence sufficient to prove such a claim. The Ninth Circuit has "set the bar high for a claim of constructive discharge because federal antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable." *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007). Poland held that the plaintiff had failed to establish constructive discharge – as a matter of law – where he based his claim on a reassignment to another office resulting in separation from his family and a demotion to a nonsupervisory position. *Id.* This is because constructive discharge only "occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Id.* (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000)).

Johns fails to meet the Ninth Circuit's high bar for constructive discharge, which requires her to prove that discrimination rendered her working conditions sufficiently extraordinary and egregious that they became objectively intolerable. *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007). Johns argues that she experienced "more than a year of discriminatory treatment" but the Court finds no evidence indicating that any incident she identifies actually involved discrimination. The evidence establishes that a computer glitch caused the initial denial of Johns' FMLA leave in early 2014. That computer error also lead to Johns' initial termination. Johns produced no evidence that either of these

1    events involved discrimination.  For this reason, and because they occurred in early 2014, these events

2    do not support Johns' claim that a work environment rendered hostile by discrimination forced her to

3    resign in April 2015.

4          Johns argues that the Postal Service withheld her FMLA leave and refused to reinstate her during

5    April and May 2014 administrative settlement discussions with EEO Specialist Trent Andrews because

6    Andrews offered Johns only money to settle her claims.  The Postmaster General objects to this as an

7    attempt to use settlement discussions as substantive evidence of discrimination in violation of Federal

8    Rule of Evidence 408.  Johns responds that this evidence is relevant and demonstrates the Postal

9    Service's alleged intention to deny Johns FMLA leave and any accommodations for her disability.  At

10   the same time, Johns claims that the evidence does not violate Rule 408 because she is not submitting it

11   to prove the validity of her claim.  But by conceding her attempt to use settlement negotiations to prove

12   discriminatory intent, Johns necessarily concedes that such evidence falls within Rule 408's prohibition.

13   During oral argument, Johns' counsel cited a new case for the first time on this issue, *Josephs v.*

14   *PacBell,* 443 F.3d 1050 (9th Cir. 2006).  As the Court noted during that hearing, making new arguments

15   in this fashion is unfair to the other side.  The Court nonetheless observes that *Josephs* is distinguishable

16   because Johns, as she stated in her Undisputed Facts Nos. 15 and 16, filed a March 27, 2014 EEO

17   complaint alleging discrimination for wrongful termination prior to her settlement discussions with

18   Trent Andrews.  Because she had filed a complaint, and she was negotiating a potential settlement of the

19   issue, there was a disputed claim at that time.  The Court sustains the Postmaster General's objection to

20   this evidence of settlement discussions and strikes the evidence.[3]

21          Johns' constructive discharge claim therefore rests on the Postal Service's failure to

22   communicate with her during the last months of her employment.  While this failure to respond to Johns

23   is regrettable, the Court finds that it is not sufficient to support a claim of constructive discharge because

24   there is no indication of any discriminatory intent behind the Postal Service's failure to respond.  The

25   _____

26   [3] The Court also notes that, even if Johns could rely on evidence that the Postal Service offered
     her only money and not reinstatement to her position during April and May 2014 settlement discussions,
     that evidence does not show that anyone discriminated against her.  After settlement discussions

27   concluded, the Postal Service gave Johns 12 weeks of FMLA leave and reinstated her to her job – with
     no strings attached.  Johns fails to explain how this sequence of events demonstrates discriminatory

28   intent.

Court also notes that Johns had not been working during the 13 months prior to her resignation. And Johns did not counter the Postal Service's point that Johns was not experiencing a work environment at all in early 2015 because she was on unpaid leave. In addition, Johns told Nurse Gower that Johns anticipated a good working environment upon her return because she was eager to work under Postmaster Mary Fine, whom she liked. All of this renders Johns constructive discharge claim deficient as a matter of law.

Johns argues that Postal Service denied her the reasonable accommodation of continuing her unpaid leave by constructively discharging her. She argues that the Postal Service's evidence that it would have continued to give her unpaid leave is not credible because Nurse Gower stated in internal correspondence that Johns' non-FMLA absence could be subject to corrective action, and several Postal employees stated in deposition that a non-FMLA protected absence may subject an employee to corrective action. We find that Johns is reading too much into these statements that simply acknowledge the nature of FMLA protection.

Johns initially cited to the *Satterwhite* and *Kent* cases to support her constructive discharge claim, but neither supports her arguments here. In *Satterwhite*, the court upheld the district court's determination that work conditions were intolerably discriminatory where the employer denied plaintiff promotions because of his race, humiliated him by forcing him to train white workers who received those promotions, relegated him to performing large amounts of dull work, and subjected him to a work environment that included racial insults. *Satterwhite v. Smith*, 744 F.2d 1380, 1381-83 (9th Cir. 1984). Similarly, the district court in *Kent* found intolerably discriminatory working conditions where the plaintiff endured "taunting by her co-workers, who ridiculed her because of her handicap," "inappropriate discipline by her supervisor, including being forced to stand by a wall, being subjected to lectures which continued over several hours, and being criticized" for behavior resulting from her handicap. *Kent v. Derwinski*, 790 F. Supp. 1032, 1040-41 (E.D. Wash. 1991). And these discriminatory conditions persisted for plaintiff Kent despite her repeated efforts to remedy the situation with her supervisor, a mental health counselor, her vocational counselor, and a union representative. *Id.* Here, a corrected computer error a year before and unreturned phone calls on two days in early 2015 bear no resemblance to the ongoing, hostile, and discriminatory work environments that justified constructive

discharge findings in *Kent* and *Satterwhite*.

Johns later cited *Draper*, *Dayton*, *Sanchez*, and *Ford* in an attempt to bolster her constructive discharge claim. Again, these cases do not help her. *Draper's* constructive discharge claim rested on a course of humiliating sexual remarks and unfavorable work assignments, culminating in derisive and mocking laughter meeting her harassment complaints. *Draper v. Coeur Rochester*, 147 F.3d 1104, 1105-06 (9th Cir. 1998). No such harsh treatment occurred here. In *Dayton,* applying California not federal constructive discharge law, the employee asked more than seven times for a specific accommodation (a sedentary job with no walking) and was consistently rebuffed, leading her to conclude that further efforts were futile. *Dayton v. Sears Roebuck*, 2015 WL 224775 at *2-3, *5, *12-13 (E.D. Cal. Jan. 14, 2015). Here, the Postal Service sent Johns information regarding reasonable accommodations, sent her numerous letters, met with her by phone to identify possible accommodations, and gave her 10 months of ongoing leave to heal from her injuries after her FMLA leave expired. And Johns concedes that no reasonable accommodation other than the ongoing unpaid leave the Postal Service granted her would have enabled her to perform her job as PMR at Amador City up through April 3, 2015. Unlike in *Dayton*, the Postal Service thoroughly and correctly assessed available reasonable accommodations. *Sanchez* involved a police officer who suffered a pay decrease that violated his due process rights. *Sanchez v. Santa Ana*, 915 F.2d 424, 426 (1990). The court held that two discriminatory decreases in pay, combined with the employer repeatedly rebuffing the employee's attempts to invoke the grievance procedure to address them, created a sufficiently intolerable environment to support constructive discharge. *Id.* at 431. Here, Johns suffered no discrimination and no adverse acts like the decreases in pay and denial of grievance rights in *Sanchez*. And finally, *Ford* affirmed constructive discharge findings for two employees. The employer accused the first employee of conspiring to institute a Department of Labor complaint, threatened to get even with her, and told her he did not want her to work for him anymore. The employer threatened the second employee with serious bodily harm, and his son threatened and pushed the employee and failed to give him adequate work instructions in the two weeks that followed. *Ford v. Alfaro*, 785 F.2d 835, 841-42 (9th Cir. 1986). These employees faced hostility and threats that in no way resemble Johns' unreturned phone calls.

Johns argues that Nurse Gower's failure to communicate with her compelled Johns to resign.

But Johns had other options to address this communication problem, which means that it did not compel her to resign. For example, Johns could have called the DRAC number provided to her – in writing – on seven different occasions as the number to call with reasonable accommodation questions. Johns testified in deposition that she did not consider calling the DRAC number before resigning "because of my mindset." Her decision simply to resign instead of making efforts to communicate with others at the Postal Service was just that – her decision because of her mindset. "An employee who quits without giving [her] employer a reasonable chance to work out a problem has not been constructively discharged." *Poland*, 494 F.3d at 1185 (quoting *Tidwell v. Meyer's Bakeries*, Inc., 93 F.3d 490, 494 (8th Cir. 1996)); *Jones*, 1999 WL 33656873, at *10 (same).

Because Johns has not provided evidence that could establish a working environment rendered objectively intolerable by discrimination, her constructive discharge claim fails as a matter of law. For this reason also, the Postmaster General is entitled to summary judgment on Johns' constructive discharge claim.

### B.  Failure to Accommodate by Engaging in the Interactive Process

Johns' remaining Rehabilitation Act claim alleges that the Postal Service failed to engage in the interactive process to find a reasonable accommodation for her disability. But the undisputed evidence demonstrates that the Postal Service interacted with Johns and granted her the only reasonable accommodation available during late 2014 through her April 2015 resignation – ongoing leave to allow her to heal.

An employer discriminates against a qualified individual with a disability who is an employee by not making an available reasonable accommodation, unless the employer can demonstrate that the proposed accommodation would impose an undue hardship on the employer's business operation. *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002). Once an employee requests an accommodation, the employer must engage in an interactive process with the employee to determine the appropriate reasonable accommodation. This process requires communication and good faith exploration of possible accommodations. The employer and the employee must communicate directly and exchange essential information. Neither side can delay or obstruct the process. *Id.*

Employers who fail to engage in the interactive process in good faith face liability for the

remedies imposed by the statute if a reasonable accommodation would have been possible. 302 F.3d at 1088-89. "The employee bears the burden of proving the existence of specific reasonable accommodations that the employer failed to provide." *Id.* at 1088; *see also Sharpe v. Henderson*, No. CV-00-71-ST, 2001 WL 34039485 at *15-16 (D. Or. Oct. 19, 2001) (granting summary judgment to employer that "clearly failed to engage in any interactive process" where plaintiff could not identify an available reasonable accommodation that the employer could have but did not provide). Johns cannot satisfy her burden here because the Postal Service provided the reasonable accommodation – ongoing unpaid leave – that she concedes would have allowed her to return to work absent her resignation.

Johns points to general statements regarding non-FMLA protected absences to argue that the Postal Service did not accommodate her. Several Postal employees stated (in internal correspondence or at deposition – not to Johns) that a non-FMLA protected absence may subject an employee to corrective action. These statements simply acknowledges the nature of FMLA protection. The whole point of the FMLA is to protect employees on medical leave from corrective action during the 12 weeks of unpaid leave that the statute affords them. Employees would need no such protection if an employee could never be subject to discipline for work absences based on medical reasons. Here, the Postal Service gave Johns more than 10 months of non-FMLA protected, ongoing leave to accommodate her injuries

And the evidence before the Court demonstrates that Johns' unpaid leave would have continued and allowed her to return to work if she had not chosen to resign in April 2015. Though she received unpaid leave from late May 2014 through her April 2015 resignation, Johns argues that the Postal Service did not tell her it had granted her unpaid leave. But Johns knew she was on unpaid leave and that she had asked for that extension of her medical leave as a reasonable accommodation in her Initial Interactive Process Questionnaire. She provides no reason she had to believe that her ongoing leave would end except for her rescinded March 2014 termination, and she fails to explain why that would justify such a belief. Johns provides no evidence that anyone at the Postal Service ever actually considered ending her reasonable accommodation leave.

Johns also argues that DRAC should have discussed unpaid leave at the June 2015 DRAC meeting. But the only purpose of that meeting was to consider Johns' allegation (made during the administrative proceeding after her resignation) that she could have returned to work between October

2014 and April 3, 2015.  Because of this allegation, a Postal Service attorney asked DRAC to meet to

review Johns' medical restrictions and determine whether a reasonable accommodation existed that

would have allowed Johns to perform the essential functions of her job between October 2014 and her

April 2015 resignation.  DRAC met on June 16, 2015, for that purpose and determined that there were

no such reasonable accommodations because of the limitations imposed by Johns' doctors, especially

the prohibition on any torso/spine twisting and the first 0-pound and then 10-pound lifting restrictions.

DRAC did not consider unpaid leave as a reasonable accommodation because Johns was already on

unpaid leave between October 2014 and April 2015 and the meeting was to determine whether a

reasonable accommodation could have allowed Johns to work during that time.

   Though Johns identified only unpaid leave as an available reasonable accommodation in her

summary judgment motion, her opposition and reply proposed another potential reasonable

accommodation.  In that brief, Johns asserted that she had proposed to Nurse Gower that Johns box mail

at the Sutter Creek Post Office with assistive devices and another person moving trays for her.  The

Postal Service should have acted on this proposal, Johns argued, and allowed Johns to box mail at Sutter

Creek starting in January 2015.  But the evidence demonstrates that Johns could not have boxed mail at

Sutter Creek between January 2015 and early April 2015 because of the restrictions imposed by her

doctors.

   An employer is not required to provide the reasonable accommodation that an employee requests

or prefers, but need only provide some reasonable accommodation.  *Zivkovic*, 302 F.3d at 1089.  And

here, the doctor-imposed ten-pound lifting restriction and torso-twisting prohibition prevented Johns

from performing the essential functions of boxing mail at Sutter Creek Post Office.  This task involves

moving trays and tubs of mail weighing 10 to 25 pounds, moving parcels weighing up to 70 pounds

within the Post Office and outside to parcel lockers, and putting mail into large groups of Post Office

boxes that require twisting to reach the various boxes.  In her supplemental declaration, Johns argues

that she could have boxed mail at Sutter Creek if someone else had moved trays of mail weighing more

than 10 pounds near the boxes and if she could have used a stool or medical knee walker to assist her.

But, in addition to ignoring the need to move parcels and pieces of mail weighing over 10 pounds, Johns

ignores her doctors' complete prohibition on twisting her torso.  A person cannot distribute mail into

walls of Post Office boxes that range from eleven to seventy-one inches from the ground without turning her torso.[4] Johns' proposed accommodation of allowing Johns to box mail at Sutter Creek from January 2015 to early April 2015 was therefore not available or reasonable.

Johns cites *Cripe v. City of San Jose* for the proposition that written job descriptions are not conclusive regarding the essential functions of a job. But *Cripe* acknowledges that an employer's judgment regarding a job's essential functions and written job descriptions serve as evidence regarding essential functions. *Cripe v. City of San Jose*, 261 F.3d 877, 887 (9th Cir. 2001). Here, the Postmaster General has produced written job descriptions and as well as testimony regarding essential job functions. And Johns has offered no evidence of alternative essential job functions. The Postmaster General's evidence therefore establishes those functions.

Johns also cites *Barnett v. U.S. Air* for the proposition that an employer cannot prevail at summary judgment on an interactive process claim if there is a dispute as to the employer's good faith engagement in the process. This is incorrect. As the court in *Sharpe* observed in analyzing *Barnett*, "unless a reasonable accommodation would have been possible, the breakdown of the interactive process would be academic." 2001 WL 34039485 at *14 (quoting *Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000)).

Here, the Court concludes that the Postal Service did engage in the interactive process in good faith through a series of letters and discussions, though communication broke down in early 2015 when Nurse Gower failed respond to medical updates or return Johns' phone calls. As a result of the good faith interactive process that did occur, the Postal Service provided the reasonable accommodation of ongoing unpaid leave that Johns requested and that she concedes would have allowed her to return to work absent her resignation. Even if the Court were to find a dispute about good faith based on Nurse Gower failing to reach out to Johns in early 2015, the Postmaster General would still be entitled to summary judgment, because Johns has failed to produce evidence demonstrating an available reasonable

---

[4] The Postmaster General also provided evidence showing that allowing Johns to box mail at the Sutter Creek Post Office in late 2014 and early 2015 would have violated the union contract then in place at Sutter Creek. The Court finds it unnecessary to reach that issue because the undisputed evidence establishes that Johns could not have boxed mail at Sutter Creek during that time because of the restrictions imposed by her doctors.

accommodation that the Postal Service did not provide to Johns prior to her resignation.

### C.   **FMLA Interference**

The parties agree that Johns received the 12 weeks of FMLA leave to which she was entitled, and that the Postal Service reinstated her to her job before the May 23, 2014 expiration of that leave. The only damages Johns claimed for her FMLA cause of action in her verified, federal-court interrogatory responses were emotional distress damages. Because the FMLA does not allow recovery for emotional distress damages, Johns' claim fails. *Farrell v. Tri-Cnty. Metro. Transp. Dist.*, 530 F.3d 1023, 1025 (9th Cir. 2008); *see also Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002) (describing the FMLA's "comprehensive remedial mechanism" and noting that, even if a plaintiff proves an FMLA violation, the FMLA "provides no relief unless the employee has been prejudiced by the violation"); *Harrell v. U.S. Postal Service*, 445 F.3d 913, 928-29 (7th Cir. 2006) (affirming grant of summary judgment for employer where plaintiff was not entitled to any damages for an FMLA violation).

Johns argued in her opposition and reply that she is also seeking equitable relief, citing to her administrative proceeding discovery responses. But discovery closed long ago, and Johns cannot now alter the damages she is seeking. Her federal-court discovery response binds her. And Johns' EEO proceeding discovery responses simply state that she was seeking in that proceeding any damages permitted for denial of her FMLA leave. The FMLA provides equitable relief (reinstatement or front pay in place of it) for a failure to reinstate an employee after an FMLA leave. The parties agree that the Postal Service reinstated Plaintiff to her job on May 16, 2014. And an employee whose medical condition prevents her from returning to work at the end of an FMLA leave suffers no compensable harm from a failure to reinstate in any case. *See Santrizos v. Evergreen Federal Savings and Loan*, No. 06-886-PA, 2007 WL 3544211 at *5-6 (D. Or. Nov. 14, 2007) (granting summary judgment to employer where employee was unable to return to work at the end of the FMLA leave period and so not prejudiced by FMLA violations). The Court therefore grants the Postmaster General summary judgment on this claim.

### III. CONCLUSION

For these reasons, the Court grants the Postmaster General's summary judgment motion and denies Johns' summary judgment motion. The Court directs the Clerk of the Court to enter judgment for the Postmaster General.

**IT IS SO ORDERED.**

DATED: May 26, 2017

/s/ John A. Mendez_____
HON. JOHN A. MENDEZ
UNITED STATES DISTRICT COURT JUDGE


Respectfully submitted,

PHILLIP A. TALBERT
United States Attorney

Dated: May 26, 2017          By:    */s/ Victoria L. Boesch*
VICTORIA L. BOESCH
Assistant United States Attorney
Attorneys for Postmaster General
Megan L. Brennan